TRI-STATE BONDING CO. *v.*
STATE of Arkansas

77-356                                               567 S.W. 2d 937

Opinion delivered June 12, 1978
(Division I)

*Douglas W. Parker,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Joyce Williams Warren,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. This appeal was taken from a judgment entered against appellant as surety on the bail bonds of several defendants in criminal cases pending in the circuit court. Bond forfeitures were entered on bail bonds in these cases on the following dates:

| Case No. | | Amt. of Bond | Date of Bond | Date of Forfeiture |
|---|---|---|---|---|
| CR-75-316 | Osborne | $2,500.00 | Nov. 7, 1975 | Oct. 26, 1976 |
| CR-76-34 ⎤ CR-76-62 ⎦ | Woodall | 2,500.00 | Feb. 12, 1976 | Jan. 25, 1977 |
| CR-76-82 | Biggers | 1,000.00 | Dec. 8, 1976 | Jan. 25, 1977 |
| CR-76-148 | Hershel | 5,000.00 | May 27, 1976 | Feb. 7, 1977 |
| CR-76-159 | Burton | 1,000.00 | June 11, 1976 | Feb. 28, 1977 |
| CR-76-163 | Landers | 500.00 | June 19, 1976 | Feb. 28, 1977 |
| CR-76-13 ⎤ CR-76-378 ⎦ | Strickland | 5,000.00 | Dec. 24, 1976 | ⎡ Mar. 30, 1977 ⎣ April 25, 1977 |

Summons was issued in each case directing that appellant show cause why judgment should not be entered against it for the amount of the bond. Judgment was entered against appellant in the total sum of $15,050. It was composed of judgments on the forfeitures of the above bonds in the amounts shown:

| | |
|---|---|
| James Edwin Osborne | $1,700.00 |
| Mike Woodall | 2,350.00 |
| Eddie Biggers | 750.00 |
| Charles Ray Hershel | 4,000.00 |
| Larry G. Burton | 750.00 |
| Floyd Landers | 500.00 |
| Preston Ray Strickland | 5,000.00 |

Criminal dockets were exhibited in each case showing that the respective defendants had failed to appear on the date the forfeiture was declared. A hearing on the order to show cause was held on May 31, 1977.

Appellants asserts two points for reversal, which we will treat in the order stated.

I

THE TRIAL COURT ERRED IN REFUSING TO CONTINUE THIS CASE TO ALLOW APPELLANT TO PREPARE HIS CASE FOR PRESENTATION TO THE COURT.

During the course of the hearing, appellant's attorney requested that the court require the state to produce records it was holding in order that appellant might ascertain whether the state was withholding information. A deputy prosecuting attorney testified that all appellant's records on every bond he made had been taken under a search warrant and that they had not been returned. This deputy had offered to have a representative of the Ft. Smith Police Department take Lee Williams, the owner of appellant, to the records to permit him to remove anything wanted for the hearing. The prosecuting attorney stated that, during a recess of the court, he wanted to make available to Mr. Williams any and all records held. Appellant's attorney's request for a continuance was denied. The prosecuting attorney asked that the record reflect that Williams had never made a request for the records pertaining to the cases which were the subject of the hearing, even though he had requested records pertaining to active cases. Appellant's attorney asked that the record reflect that he had requested that the prosecuting attorney return the

records but the prosecuting attorney refused, saying that he would return no records without a court order. The prosecuting attorney denied that this was so.

The exact period of time allowed Williams to review his own records before the hearing was resumed is not shown. He obviously referred to some of them in his later testimony. During the recess, the court conducted its call of the municipal court appeal docket. After this recess, appellant did not register further objection or indicate any prejudice. It appears that all his records were surrendered to him. A second recess was declared in order to permit Williams to retrieve additional records from his own office. He admitted that his failure to produce certain records, or information they would disclose, particularly in regard to his expenses in efforts to locate and apprehend defaulting defendants, was not attributable to the prosecuting attorney's possession of some of his records. The records as to his expenses apparently were never out of Williams' possession, except for checkbooks which did not affect his ability to show what his expenses had been. Williams' only excuse for his inability to show his expenditures was that "he didn't have time to go up in the attic and dig out those expenses." The appellant did, rather late in the hearing, ask for a continuance of two weeks for "documentation of expenses." Summonses on these forfeitures had been served on appellant as long as seven months prior to the hearing. Only one of them had been served less than two months prior to hearing. There is no basis whatever for holding that the circuit judge abused his discretion in denying the motion for continuance.

## II

### THE TRIAL COURT ABUSED ITS DISCRETION IN ENTERING JUDGMENT UPON THE BOND FORFEITURES IN AN EXCESSIVE AMOUNT.

Appellant admits that the judgment on the Landers bond is proper, but contends that the judgments in the other cases are excessive. He points out that we have said that the giving of bail bonds is to be encouraged in order to give

freedom to the accused pending trial and to relieve the state of the cost of maintaining him until his case can be heard and that the purpose is to secure the administration of justice, not enrich the treasury. See *Central Casualty Co.* v. *State,* 233 Ark. 602, 346 S.W. 2d 193.

Appellant then complains that there is no evidence to show that the state spent any money in the apprehension of those defendants who appeared and were sentenced subsequent to the forfeiture of their bonds. Of course, the burden of proof in the matter was on appellant. *Hickey* v. *State,* 150 Ark. 304, 234 S.W. 168. It would be quite difficult to allocate the cost of utilization of the regular personnel and facilities of the judicial system and law enforcement agencies for the processes necessary when a defendant on bail fails to appear. It is also impossible to make an accurate estimate of the expense of the disruption of a court's docket attendant upon non-appearance of a defendant at a scheduled time and the resulting waste of judicial and juror resources. While the fact that no extraordinary expenditures are made by the state is a matter for consideration, it certainly is not the measure of the recovery against the bail, who has responsibility for the appearance of his principal.

In considering the forfeiture of bail, the underlying basis of admission to bail must be considered. The defendant, rather than being held in the custody of the state, is released to the custody of the surety, who is responsible for the defendant's appearance at the time fixed. 8 Am. Jur. 2d 782, 783, 784, 837, Bail and Recognizance, §§1, 3, 4, 94; 8 CJS 54, Bail, § 29. See also, *Adler* v. *State,* 35 Ark. 517, 37 Am. Rep. 48. The defendant is regarded as being in the custody of his bail from the time of the execution of the bail bond until he is discharged, and his bail is considered as a jailer of his own choosing. 8 CJS 59, Bail, § 31. Although the surety is not expected to keep the principal in physical restraint, he is expected to keep him within the state. *Adler* v. *State,* supra; 8 Am. Jur. 2d 837, Bail, § 94.

Matters in defense on forfeiture of the bond must be set up by answer. *Miller* v. *State,* 35 Ark. 276. Technical defenses have been dispensed with and the courts consider only those

defenses that affect the substantial rights of the parties. *Havis v. State,* 62 Ark. 500, 37 S.W. 957. Where there is no act of God, the state, or of a public enemy, or actual duress to prevent appearance by an accused on bail at the time fixed by the terms of the bond, the security is not released from forfeiture. *Sugarman v. State,* 28 Ark. 142; *Adler v. State,* supra.

The failure of each of the defendants to appear at the time fixed was sufficient basis for forfeiture of the bond, when noted on the record. *Craig v. State,* 257 Ark. 112, 514 S.W. 2d 383. The proceeding after forfeiture and before judgment is a summary one. *Hickey v. State,* supra. The orders to show cause merely afforded the bondsman an opportunity to be heard with respect to remission of all or some part of the forfeiture. See *Craig v. State,* supra.

The trial court's authority to remit a forfeiture when the accused is subsequently surrendered by the surety is discretionary. Ark. Stat. Ann. § 43-729 (Repl. 1977). The question here is whether the trial court abused its discretion in fixing the amount of the judgments. *Hickey v. State,* supra. This discretion is not arbitrary, and it is to be fairly exercised on the facts in the particular case. *Central Casualty Co. v. State,* 233 Ark. 602, 346 S.W. 2d 193. The mere fact that the bail took the principal into custody after forfeiture and surrendered him to the authorities, even during the same term of court at which the forfeiture was declared or the defendant's appearance had been required, does not entitle the bail, as a matter of right, to a remission of the penalty, even though the return of the principal was at the expense of the bail. *Hickey v. State,* supra. It devolved upon the appellant to establish facts to justify favorable action in the exercise of the trial court's discretion. The failure to even allow the bail his expenses in the matter is not necessarily an abuse of the trial court's discretion. *Hickey v. State,* supra. And when the principal does not appear, there is no exoneration from liability under the bond, regardless of the extent of the search by the surety, if the surety shows no more than the disappearance of the principal. *Bryan v. State,* 113 Ark. 598, 167 S.W. 484.

In the case of Mike Woodall, appellant was allowed credit for only $150. Woodall was returned by appellant from

a small town near Jonesboro. Woodall was surrendered on March 9, 1977. His case had been set for November 30, 1976. Williams had mailed Woodall a letter on November 5, 1976, notifying him that he should be in court on that date. Appellant began to look for Woodall, when the public defender's office stated that there had been no response to a letter from it to Woodall. The search for Woodall included inquiries in West Virginia and Tennessee, as well as various places in Arkansas. Williams testified that his expenses were $300 to $400. The trial court allowed credit for $400, but for some reason deducted the bond fee of $250 from that allowance. It seems to us that this action would tend to discourage rather than encourage the making of bail. There is little incentive for the surety to make the effort and expenditure necessary to return a fugitive if he is to be penalized to the extent that he does not even salvage his expenses when his efforts are successful. We think that a judgment for more than $1,800 on this bond is excessive. The judgment in that case is reduced to that amount.

Eddie Biggers was to have been in court on December 17, 1976. According to Williams, Biggers appeared in his attorney's office "half-drunk" on that date and was sent home by the attorney, who later advised the court that Biggers was "running." Williams testified that he spent several hundreds of dollars paying rewards to informants for information about Biggers' whereabouts. An agent for appellant testified that the rewards paid totalled $500. He said that he worked for a week and a half to two weeks seeking to rearrest Biggers and that three others worked over a week each. He finally located Biggers in a Ft. Smith bar and called the police and sheriff's office to aid in the apprehension that resulted in the surrender of Biggers. This agent testified that his salary for two weeks devoted to the search for Biggers amounted to $500. He stated that four deputy sheriffs and five city policemen assisted in the arrest. Williams testified that employees of the sheriff's office and several police officers worked diligently in trying to assist in the apprehension of Biggers. Williams said that he spent a total of six or eight hours looking for Biggers himself. It seems, however, that Biggers had also failed to appear in another case in which appellant made his bond in the sum of $2,500, so we cannot say that there was any abuse of discretion in allowing only $250 credit on this forfeiture.

Charles Ray Hershel was scheduled to appear on February 7, 1977. He actually appeared on May 4, 1977, and was admitted to bail in the sum of $2,500 rather than the $5,-000 bond previously made by appellant. According to Williams, Hershel's appearance was a result of Williams' advising the employee of the sheriff's office that Hershel was in the army. Williams testified that he paid the expense of a plane and pilot to take a deputy sheriff to Georgia to take Hershel into custody and to return him to Ft. Smith. He estimated his total expense to be close to $570. The last notice that appellant gave Hershel of his obligation to appear on February 7 was sent on November 5, 1976. Under the circumstances, including the fact that Hershel was admitted to a lesser bail after having failed to appear on the bond made by appellant, we feel that the $4,000 judgment should be reduced to $2,500.

It has been suggested in a dissent that any judgment on this forfeiture is barred by Title 50 U.S.C. App. 513 (3). This is the first time that this section of the Soldiers' & Sailors' Civil Relief Act has been mentioned in this proceeding. Since appellant did not raise the question in the trial court, it is not in issue. Since appellant did not argue that the act applied on appeal, he has waived that ground for relief. The state has never had an opportunity to respond to any contention that appellant was entitled to relief under this act. But even if the question were properly before us, appellant could not prevail on this record.

There is no question about the mandatory effect of the act upon showing of the requisite facts. *United States* v. *Jeffries,* 140 F. 2d 745 (7 Cir., 1944). On the other hand, the surety is not entitled to relief in the absence of a showing that the principal was in the military service on the date he was scheduled to appear, that the surety made an unsuccessful effort to secure Hershel's appearance on that date and that Hershel's military service prevented his attendance on that date. See *State* v. *Benedict,* 234 Iowa 1178, 15 N.W. 2d 248 (1944); *Briggs* v. *Commonwealth,* 185 Ky. 340, 214 S.W. 975, 8 ALR 363 (1919). *U.S.* v. *Carolina Casualty Ins. Co.,* 237 F. 2d 451 (7 Cir., 1956); *Cumbie* v. *State,* 367 S.W. 2d 693 (Tex. Cr. App., 1963); *People* v. *Continental Casualty Co.,* 284 App. Div. 944, 134 N.Y.S.

2d 742 (1954). See also, *People* v. *Walling,* 195 Cal. App. 2d 640, 16 Cal. Rptr. 70 (1961); *Ex parte Moore,* 244 Ala. 28, 12 So. 2d 77 (1943). The burden was on appellant to make this showing. The record, as abstracted, is far from conclusive on this point, to say the least.

The bond was made on May 27, 1976. Appellant mailed letters to Hershel beginning as early as June 14, and as late as February 2, 1977. Williams testified that notice of the appearance date of February 7, 1977, was given in a letter sent Hershal on November 5, 1976. Appellant testified that Hershel simply did not appear, that he "jumped bond" and that appellant expended $570 or better to see that he was brought back. Although Williams later testified that he knew that Hershel was in the army when the bond was forfeited, the record as abstracted shows nothing to indicate that the surety was prevented from enforcing Hershel's attendance on that date, or of any effort appellant made to have Hershel in court on the date scheduled until after the forfeiture or that he made any effort to return him, except for notifying Mrs. Stancil that Hershel was in the army in Georgia and that he sent a plane to Augusta, Georgia, to take a deputy sheriff, who returned Hershel to Ft. Smith. What is more important, there is no showing that Hershel's entry into the military service was not by voluntary enlistment. That showing was essential to relief of the surety. *Cumbie* v. *State,* supra. It was never intended that the army be a haven for criminals.

Larry Burton was scheduled to appear on February 28, 1977. Williams testified that he spent $280 in attempting to locate Burton. There is some testimony about Burton having been in jail on another charge at some time between the forfeiture and the hearing. This did not relieve the surety. See *Havis* v. *State,* 62 Ark. 500, 37 S.W. 957. We find no abuse of discretion in rendering judgment for $750 on this bond.

Preston Ray Strickland was released on bail on $5,000 on two separate charges. He failed to appear on either of them. A bench warrant was issued for him on April 15, 1977. According to Williams, Strickland was in the city jail on a drunkenness charge after that date, but was released before Williams could surrender him. He stated that he had expend-

ed $150 trying to apprehend Strickland without success. Williams felt that Strickland was still in Ft. Smith at the time of the hearing and said that the Strickland family has a tendency to try to hide one another. We find no abuse of discretion in the judgment for the full amount of this bond.

In the case of James Edward Osborne, it was stipulated that the defendant did not appear and became a fugitive from justice at the time of the forfeiture. Immediately after the bond was made, Osborne entered the Veteran's Administration Hospital at Fort Roots. His attorney testified that before Osborne was released on bail, Osborne's relatives said they wanted to arrange for his release from jail, so they could put him in this hospital. A deputy sheriff advised the hospital that a warrant for Osborne was outstanding. Osborne left the hospital at some time not definitely fixed. When the trial date was set, Osborne's attorney was told by one of Osborne's sisters that she did not know where her brother was. Williams testified that he had made a trip to Hayward, California in search of Osborne. The cost of this trip was estimated at $800. An unlawful flight warrant was issued at the request of the prosecuting attorney on November 3, 1976 and the Federal Bureau of Investigation undertook to locate Osborne. Williams said that he gave the FBI the address of a relative of Osborne living in Hayward. The Bureau reported on December 22, 1976, that Osborne was dead. Williams presented a newspaper clipping from a Ft. Smith newspaper dated December 22, 1976, announcing the death and funeral of Osborne. Williams testified he had made three trips to Booneville, two to Magazine and one trip to Keota, Oklahoma, in search of Osborne or information about him. He located Osborne's automobile in Keota. He stated that his telephone expense in this case was $35 and estimated his total expense at $875.

Williams admitted that he received notice of criminal trial settings for October 26, 1976, listing Osborne's name. This list had been mailed September- 24, 1976. Williams testified that letters written to Osborne at the address he had given, advising him of this trial date were not returned. Williams testified that, under the procedure established in appellant's office, the secretary sent a letter notifying each defendant for whom they had made a bond of any court

appearance date shown on the list furnished to him. He could not explain why his office records did not disclose that a letter was written to Osborne on this occasion, as the secretary made a notation showing the date of the letter. There were no entries on the record card for Osborne between May 18 and October, 1976.

The employee of the Sebastian County sheriff's office in charge of records testified that a bench warrant was issued for Osborne on October 29, 1976 and entered into the National Crime Information Center on November 1, 1976. The sheriff's office was not notified of Osborne's death until sometime in January. A warrant was issued for Osborne on November 12, 1976 and placed in the hands of Detective Charles Hill of the Ft. Smith Police Department on the next day. At some time, not established, Hill had notified the Fort Roots Hospital that he held a warrant for Osborne. He received information that Osborne was in this hospital from a representative of appellant.

It has been suggested in a dissenting opinion, without supporting authority, that it is the better rule that when a person is suffering from a mental disease and is confined to a mental hospital, the surety is discharged under the theory that an act of God has intervened. It has been said that insanity of the principal is a defense for nonperformance by the surety. See *Hood* v. *State*, 231 Ark. 772, 332 S.W. 2d 488. The record is devoid of evidence of Osborne's *insanity*. In *Hood*, we held that the defense that the surety was relieved by reason of the principal's confinement in the Arkansas State Hospital raised a jury question whether the nature of the confinement was such as to relieve the bondsman from the bond forfeiture. In doing so, we relied, in part, upon *Briggs* v. *Commonwealth*, 185 Ky. 340, 214 S.W. 975, 8 ALR 363 (1919), wherein it was held that "where the principal is *actually confined* in an insane asylum, being thus *in the custody of the state,* and beyond the *powers of the surety to produce him,* the latter is discharged." [Emphasis ours.] There is no evidence that Osborne was committed to, or confined at, Fort Roots, or that he was in custody. Certainly, Williams' testimony that he was sure Osborne was committed because he was a mental case was not sufficient. Osborne's lawyer said that he and

some relatives of Osborne suspected that he was mentally ill and that the brothers and sisters of Osborne brought him an affidavit requesting that Osborne be committed. He did not say that Osborne was committed. He did say that he did not advise the bonding company that he was making a maneuver to *permit* Osborne to enter the VA Hospital. As far as this record discloses, Osborne's admission to the hospital was voluntary.

After remand in *Hood,* supra, judgment was rendered on a jury verdict against the surety and it was affirmed here. *Hood* v. *State,* 234 Ark. 901, 356 S.W. 2d 28. We held that there was no abuse of the trial court's discretion in its refusal to set aside the forfeiture, since the principal's admission to the Arkansas State Hospital was voluntary and, as was the case here, the trial court had good reason to believe that the principal entered the hospital for the purpose of avoiding a trial. We approved as correct an instruction to the jury that if the principal was confined to the Arkansas State Hospital on the date set for his appearance in court because of his *insanity,* and was unable to attend court for that reason, it would find for the surety; but, on the other hand, if the principal was admitted as a voluntary patient for treatment of alcoholism and could have been released if he had requested it or if the hospital authorities had been informed that criminal charges were pending, it would find for the state. We said that the issue was whether the principal was unable to attend on account of *insanity.* On evidence at least as strong as that here, we said that the surety had not met his burden of establishing, to the satisfaction of the jury, that the principal did not appear in court because of his insanity.

We are certainly unable to say that appellant here meets its burden of proof sufficiently for us to require the reversal of the trial court's judgment in this case. The voluntary hospitalization of Osborne did not relieve appellant of its responsibility. *Hood* v. *State,* 234 Ark. 901, 356 S.W. 2d 28. There is no evidence to indicate that Osborne died before the scheduled appearance date, so appellant was not relieved of his responsibility on that account. Since appellant's expenses were only estimated, we are unable to say that the judgment for $1,700 in this case was an abuse of discretion.

The judgment is modified by reducing it as indicated so that the total judgment is in the amount of $13,000. As modified, the judgment is affirmed.

We agree. HARRIS, C.J., and GOERGE ROSE SMITH and HOLT, JJ.

BYRD, HICKMAN and HOWARD, JJ., dissent in part.

GEORGE HOWARD, JR., Justice, dissenting. I am compelled to dissent from the majority's opinion affirming the trial court in granting judgments on the bond forfeitures involving James Edwin Osborne in the amount of $1,700.00 and in the case of Charles Ray Hershel in the amount of $4,000.00, but reduced by the majority to $2,500.00. It is my belief that the evidence and the law justify a complete exoneration of the bondsman for the failure of these two defendants to appear in court for trial. Consequently, there was an abuse of discretion on the part of the trial court in rendering any type of judgment in behalf of the state involving these two defendants.

First, relative to James Edwin Osborne, the record reflects that before his scheduled appearance in the Circuit Court of Sebastian County, Mr. Osborne was admitted to the Veterans Administration Mental Hospital (Fort Roots) in North Little Rock, Arkansas. The record also indicates that he had been confined to this hospital at least twice previously because of a mental condition. Sometime subsequent to his admission to the hospital, Mr. Osborne departed the State of Arkansas for the State of California.[1] The evidence reflects that he was killed in Oakland, California, on December 22, 1976, approximately fifty-seven days after his scheduled appearance in the Circuit Court.

It is clear from the record that the bondsman was unaware of Mr. Osborne's confinement to Fort Roots and indeed, was unaware of his departure from the hospital. However, it seems clear, from the record, that Mr. Osborne's attorney knew that upon making bail, Mr. Osborne would

---

[1]It is not clear from the record whether Mr. Osborne was released from the hospital or left without being formally released. It seems that his departure from the hospital was before his scheduled trial.

voluntarily and immediately enter Fort Roots, but his attorney, an officer of the court, did not alert the court or inform the bondsman.

Mr. Osborne's attorney testified as follows:

"A. . . . we suspected that he (Osborne) was mentally ill . . .

"Q. . . . did you ever communicate to his bondsman that you were going to have him placed in the hospital?

"A. I'm not sure Doug. This was back in 1975 . . . "

*See:* Abstract in appellant's brief, pages 31 through 34.

It appears that the better rule is that where a person is suffering from a mental disease and is confined to a mental hospital, the bondsman is discharged under the theory that an act of God has intervened preventing performance. Moreover, if, during confinement to the hospital, the patient-defendant escapes, the surety cannot be held accountable for failure to produce him. *Hood* v. *State,* 231 Ark. 772, 332 S.W. 2d 488. *See:* 8 C.J.S. Bail § 77 at page 221 where it is provided as follows:

"It has been held that where a lunatic is confined in a state hospital or asylum the bail are discharged because of an act of God preventing performance."

*See also: Adler* v. *State,* 35 Ark. 517, where we made the following observation.

". . . [T]he inability of the principal to perform the condition of the bond, produced by sickness to the degree which in law is deemed an impossibility proceeding from the act of God, will discharge the bail."

In *Hood,* we recognize the great weight of authority is that a bondsman will be exonerated from liability on bail where the principal is confined because of insanity.

In the instant case, Mr. Osborne, during his confinement at Fort Roots, was in custody of an institution that is under the control and supervision of the Federal Government and it was beyond the power of the bondsman to produce him for trial and, consequently, the bondsman should be discharged. Moreover, the state has not shown that it was required to expend any funds whatsoever in connection with the non-appearance of Mr. Osborne.

Relative to Charles Ray Hershel, the evidence clearly shows that on the date that he was to appear for trial, he was a member of the United States Armed Forces, serving in the State of Georgia. This was called to the attention of the trial court during the hearing which resulted in a judgment against the bondsman in the amount of $4,000.00, but reduced by the majority to $2,500.00.

The bondsman testified as follows:

"A. . . . In this particular case he joined the Army and in joining the Army he went to Augusta, Georgia, I think it was. While he was in Georgia we found out where he was — the Sheriff's Office did not know — and we notified Mrs. Stancil that he was in the Army in Georgia, and Mrs. Stancil, in turn, contacted the proper authorities there and they put him under house arrest and his Company commander, it is my understanding at this time, is in trouble over this thing because he bumped him from the Army without permission."

The bondsman, Mr. Williams, further testified as follows:

"A. . . . I know he was in the Army when the bond was forfeited. We pursued the man and we got information that he was in the Army and we located his base station, and Mrs. Stancil was given the information and she, in turn, called down there and told them her warrant numbers and followed through by mailing them the warrants, and he was put under house arrest. His Company commander, I think his name was Smith bumped him from the Service."

*See:* Abstract in appellant's brief at pages 59 and 60.

Under Title 50, U.S. Code Ann., § 513(3), it is provided as follows:

"(3) Whenever, by reason of the military service of a principal upon a criminal bail bond the sureties upon such bond are prevented from enforcing the attendance of their principal and performing their obligation *the court shall not enforce the provisions* of such bond during the military service of the principal thereon and may in accordance with principals of equity and justice either during or after such service discharge such sureties and exonerate the bail." (Emphasis added)

Under the above quoted provision, the trial court was duty bound not only from proceeding in any manner with the case pending against Mr. Hershel, including forfeiture proceedings against the bondsman, but was required to either, during Mr. Hershal's tenure with the United States Army or after his discharge, to completely discharge the sureties and exonerate the bail.

In *White System of Lafayette* v. *Fisher,* La. 1943, 16 So. 2d 89, the court emphasized that the above quoted provision manifests an intention not only to liberalize the provisions with respect to military personnel, but to extend the same benefits to those who have engaged themselves as surety in behalf of such military personnel.

I would reverse the trial court involving the forfeitures of James Edwin Osborne and Charles Ray Hershel.

I am authorized to state that Justices Byrd and Hickman join in this dissent.